IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

## Docket No. 3:24-cv-01309-MMH-LLL

**DANIEL GREAGOR,**

*Plaintiff,*

*v.*

**JACKSONVILLE SHERIFF'S OFFICE**
(as the operational name of the Consolidated
City of Jacksonville); **TIMOTHY KEVIN
WATERS,** in his official capacity as Sheriff
of the Consolidated City of Jacksonville,
Florida; **CECIL A. GRANT, III,** Individually;
and **MICHAEL DUNNEBACK,**
Individually.

*Defendants.*

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Daniel Greagor, brings this action seeking monetary

damages, attorney's fees, and costs against Defendants, and alleges

as follows:

1.  This is an action for damages, attorney's fees, and costs for

the deprivation of Plaintiff's rights secured by the Fourth and

Fourteenth Amendments to the United States Constitution, as well as claims under Florida law.

## JURISDICTION AND VENUE

2.  Plaintiff invokes the jurisdiction of this Court pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331 and 1333, as to the federal claim herein.  The Court has supplemental jurisdiction as to the state law claims pursuant to 28 U.S.C. § 1367.

3.  Venue in this district is proper pursuant to 28 U.S.C. § 1391, in that the cause of action arose in this district.

## PARTIES

4.  Plaintiff, Daniel Greagor, is a resident of Clay County, Florida, and a citizen of the United States.

5.  At all times relevant, Plaintiff was a resident of the city of Jacksonville, Duval County, Florida.

6.  Defendant Jacksonville Sheriff's Office (hereinafter "JSO") is the operational name of the law enforcement agency serving the Consolidated City of Jacksonville. Plaintiff brings suit against JSO and Sheriff Timothy Kevin Waters in his official capacity, which is treated as a suit against the City of Jacksonville.

2

7. Defendant, Cecil A. Grant, III, was, at all times relevant to this complaint, a sworn member of JSO acting within his capacity as a law enforcement officer.

8. Defendant, Michael Dunneback, was, at all times relevant to this complaint, acting within the scope of employment.

9. Defendant, Michael Dunneback, was, at all times relevant to this complaint, a sworn member of JSO acting within his capacity as a law enforcement officer.

10. Defendant, Timothy Kevin Waters, in his official capacity as Sheriff of the City of Jacksonville, Florida, was at all times relevant, responsible for the supervision, training, instructions, discipline, control, and conduct of officers of JSO and made policy for JSO with respect to seizures, searches, arrests, and the use of force. At all times relevant, Defendant Waters had the power, right, and duty to train and control his officers, agents, and employees to conform to the Constitution of the United States of America and to ensure that all orders, rules, instructions, and regulations promulgated for JSO were consistent with the Constitution of the United States of America.  At all times relevant, Sheriff Waters'

3

officers, agents, and employees acted under color of State of Florida law.

## FACTUAL ALLEGATIONS

11. The following facts are supported by body-worn camera footage from Defendants Grant and Dunneback and another, unnamed, officer, which captured the interactions and events described herein.

12. On December 23, 2022, Defendants Cecil A. Grant, III, and Michael Dunneback, acting in their official capacity as sworn law enforcement officers employed by JSO, were dispatched by JSO police dispatchers to 8089 Leafcrest Drive, Jacksonville, Florida 32244.

13. Upon arrival, Defendants Grant and Dunneback made contact with Plaintiff's wife, Jennifer Greagor.  Plaintiff's minor children, D.G. and M.G., and Plaintiff's mother-in-law were also present.

14. Jennifer stated that Plaintiff threw her mother's belongings out the door, and was screaming and threatening to call and have her mother removed from the house.  Jennifer told Defendant Grant that Plaintiff did not touch her, but that he has been violent before.

4

Jennifer complained that Plaintiff has significant pain, so he takes morphine and drinks "way too much." Jennifer said that two years ago she filed an injunction against Plaintiff after he had put his hands on Jennifer, and that he completed anger management and she allowed him back into the home. She asked the officers if she could obtain another injunction in the future if she felt Plaintiff was a danger, indicating that she was not, at that time, in fear of any physical abuse. At no point did she assert that Plaintiff had committed any crime.

15. Defendant Grant explained to Jennifer that they cannot force him to leave since he did not commit a crime. Rather, Defendants Grant and Dunneback explained Florida's Marchman Act, and suggested that as an option to force Plaintiff to get help.

16. Jennifer went into the bedroom where Plaintiff was sleeping and woke him up. Defendants Grant and Dunneback followed her into the bedroom. Body worn camera footage shows that Plaintiff was sleeping at the time they entered the room. Jennifer immediately left the room, even before Plaintiff was out of bed.

5

17. Plaintiff was upset to be woken up to two police officers in his room.  Plaintiff asked why the police were in his house.  Plaintiff explained that he works nights and was sleeping, and asked the officers to leave his house.  Defendants Grant and Dunneback repeatedly asked Plaintiff if he was arguing with Jennifer.  Plaintiff repeated that he was sleeping and told Grant and Dunneback that he would not answer their questions.  Plaintiff told police he wanted his lawyer.  Defendants Grant and Dunneback ignored his request to speak with an attorney and continued asking him if he was arguing with Jennifer.

18. Plaintiff continued to request that his attorney be present for questioning.  Defendant Dunneback replied, "Sure, if you want to call your attorney at, ah, let's see, 6:30 at night on a holiday and pay for him to, like $400 dollars an hour answer questions."  At that point Plaintiff raised his voice.  Defendant Grant told him that if he continues to raise his voice, he would be arrested for resisting arrest.  Plaintiff and Defendants Grant and Dunneback continued to argue, with Plaintiff repeatedly refusing to answer questions.  Defendants Grant and Dunneback continued to ask Plaintiff questions.  Plaintiff continued to refuse.  Plaintiff asked Defendants

6

Grant and Dunneback to leave his house. Plaintiff eventually laid back down in his bed and covered up to go to sleep.

19. Defendants Grant and Dunneback, who had no basis to arrest Plaintiff at that time, exited the bedroom. They once again made contact with Jennifer. Defendant Dunneback advised Jennifer to call Plaintiff's job and tell them he was drinking. Defendant Dunneback explained that he cannot force Plaintiff to leave.

20. Plaintiff then exited his room, and the parties began speaking while standing just outside the bedroom. Plaintiff was standing next to Defendant Grant. Defendant Grant told Plaintiff, "You said you were going to sleep." Plaintiff put his right hand up to demonstrate to officers that he demonstrated no threat. Plaintiff made no contact with Defendant Grant's person.

21. Defendant Grant then punched Plaintiff in the upper chest, causing him to fall backward. As Plaintiff was falling backward, Defendant Grant punched him in the left side of his face. Plaintiff retreated through the doorway of his bedroom while Defendant Grant continued to pound Plaintiff's face with his right

fist.  Throughout this time, Defendant Grant repeated, "You don't touch me!" and Defendant Dunneback repeated, "Don't touch him!"

22. Plaintiff fell to the ground next to his bed and Defendant Grant jumped on top of him, continuing to pound and punch Plaintiff in the face.  Plaintiff covered his face with his hands while Defendant Grant was attacking him, and Defendants Grant and Dunneback repeated orders to Plaintiff to put his hands behind his back.

23. Plaintiff could not put his hands behind his back because he was covering his face to protect from Defendant Grant's punches.  Plaintiff was yelling "STOP!" throughout the attack.

24. Defendants Grant and Dunneback eventually placed Plaintiff's hands behind his back and took him into custody.  Defendant Grant told Plaintiff, "You're not gonna put your hands on me."

25. Plaintiff exclaimed, "You just beat the shit out of me for no reason!"  Defendant Grant replied, "Keep your hands to yourself."

26. Defendants Grant and Dunneback then walked the handcuffed Plaintiff to his vehicle.  While escorting Plaintiff to the

vehicle, Defendant Grant was bending Plaintiff's wrist in the form of a wrist lock, causing extreme pain to Plaintiff.

27. When Plaintiff yelled, "You beat the shit out of me in my own house!" Defendant Grant told him, "Keep your hands to yourself next time."

28. Defendants Grant and Dunneback called rescue for Plaintiff. Defendants Grant and Dunneback made Plaintiff wait for rescue outside while Plaintiff was in his boxer shorts. According to Weather Underground,[1] the temperature in Jacksonville, Florida on the date and time of the incident was 41° Fahrenheit. Plaintiff repeatedly requested clothes or a blanket while Defendants Grant and Dunneback joked about Plaintiff being cold.

29. Plaintiff remained outside in his underwear for twenty minutes and fifty seconds while Defendants Grant and Dunneback awaited a larger police vehicle to transport Plaintiff to jail. Once Plaintiff was placed in the back of a police vehicle, Defendants Grant and Dunneback turned off their body worn cameras.

---

[1] Retrieved from
https://www.wunderground.com/history/daily/us/fl/jacksonville/KJAX/date/2022-12-23.
Last accessed on June 27, 2024.

30. The unnamed officer who drove the transport vehicle, however, had his body worn camera running.  His body worn camera captured Defendant Grant explaining his version of events:

Officer:  22 and 88 or?

Grant:  Ah no, he-he pushed me.

Officer:  Oh okay.

Grant:  Yep.  We're about.  We were literally about to leave.  He was like, I'm going to bed.  We had nothing and he came out talking that ****.  Like got in my face and was like this and I was just like Nope.  Nope.  Not doing that.

Officer:  Not today.  Not today.

Grant:  Got outta bed.  Went to jail.

31. In his report, Defendant Grant described the events similar to how he explained them to the unnamed officer:

On 12/23/22, I was dispatched to the list location in reference to a verbal dispute.

I was talking with Daniel Greagor (suspect).  While I was speaking with the suspect, the suspect put his hand on my shoulder and chest area and pushed me backwards.  Due to his size, I lost my balance and almost fell down.  I then punched the suspect in his face.  The suspect fell backwards.  I gave him loud verbal commands to put his hands behind his back.  The suspect refused and began to actively resist me by pulling his hands away and balling up his fist.  I punched the suspect in the face until he complied with my verbal commands.

10

It should be noted that while I was talking with the suspect, he was yelling and cursing at me loudly the entire time.

Rescue responded to the scene. The suspect complained of head and neck pain. It should be noted that the suspect yelled and cursed at the EMTs. While the EMTs were attempting to check his vitals, he continued to yell and curse at them and refused their services.

The suspect was transported to the PTDF without incident.

Case cleared by arrest.

32. Defendant Grant resigned from JSO and was arrested for official misconduct for his actions in this case. The records related to Defendant Grant's prosecution are sealed.

33. Despite Defendant Grant resigning and being charged with official misconduct, no other individuals, including Defendant Dunneback, have been investigated or punished for their role in the incident.

34. Defendant Grant's use of force is part of a longstanding practice by JSO of using and tolerating the use of force against individuals who are not resisting.

35. In December 2004, a member of JSO slammed Sammy Lee Evans to the ground. As a result, Mr. Evans's head hit the ground

with such force that it resulted in Mr. Evans' death.  Mr. Evans was not resisting the arrest, which was for an open container of alcohol. The JSO member involved was not disciplined or reprimanded for their use of force against Mr. Evans.

36. In January 2006, members of JSO broke the right jaw of Bryan Barnes when effectuating his arrest.  The JSO members struck Barnes despite the fact that Barnes complied with all of their commands and did not resist the officers while being arrested. There was no JSO investigation of the officers' use of excessive force against Mr. Barnes until prompted by the City of Jacksonville Office of General Counsel sending a complaint to JSO on January 12, 2011.  This complaint and the accompanying investigation occurred four years after the incident, three years after Mr. Barnes filed a federal lawsuit against the officers involved and Sheriff Rutherford, and nearly two years after said lawsuit was settled.  The JSO Internal Affairs Unit concluded that the charge of excessive force against Police Lieutenant R. W. Beltz and Police Officer C. M. Weippert be classified as "not sustained."

37. In January 2006, a member of JSO struck Ronal Ferrera in the face three times with his knee while Ferrera was handcuffed.

12

The JSO member involved was not disciplined or reprimanded for their use of force against Mr. Ferrera.

38. In October 2007, two members of JSO, along with a civilian "ride along," slammed the head of Colin Runge into a steel door in the intake area of the jail. At the time, Runge was fully restrained and unable to resist the officers as he was in total appendage restraint, otherwise known as being "hog-tied."

39. In January 2008, a member of JSO slammed Larue Perkins onto the pavement of a parking lot, breaking his jaw. At the time, Perkins was complying with the officer's directive to leave the parking area. Perkins was then falsely arrested after having his jaw broken. Perkins filed a written internal affairs complaint with JSO shortly after the January 2008 incident. On January 21, 2011, almost three years after the incident, the JSO Internal Affairs Unit received an "in-house complaint" from the City of Jacksonville's Office of General Counsel regarding the January 2008 incident involving Perkins. The subject matter of the complaint was the JSO officer's excessive use of force against Perkins. The in-house complaint was then investigated by the JSO Internal Affairs Unit, which concluded that the charge of Excessive

13

Force against Police Officer R. J. Tolen be classified as "not sustained."

40. In September 2008, a member of JSO dragged James Lunsford out of a police vehicle while he was handcuffed and dropped Mr. Lunsford on his head, leaving Mr. Lunsford paralyzed. The officer did so despite Lunsford's warning to the officer that Lunsford had four screws and a plate in his neck. Then JSO Sheriff Rutherford had actual notice of Mr. Lunsford's encounter with JSO because of a federal lawsuit filed against him, yet he failed to conduct an internal affairs investigation into the incident. The JSO member involved was not disciplined or reprimanded for his actions against Mr. Lunsford.

41. In May 2010, a member of JSO fractured multiple bones in David Kemp's face by violently striking him as he laid on the ground in compliance with the officer's commands to do so. Sheriff Rutherford had actual notice of Mr. Kemp's encounter with JSO because of the federal lawsuit filed against him, yet Sheriff Rutherford failed to conduct an internal affairs investigation into the incident and officer involved and failed to discipline the officer involved.

14

42. In March 2012, members of JSO questioned Kyle Fowler concerning a stolen vehicle.  At the beginning of the questioning, Mr. Fowler was told by the JSO members that he was free to go at any time he chose.  After initially agreeing to speak to the officers, Mr. Fowler turned away from the JSO members due to the behavior of the officers and told them he was not interested in speaking anymore, and began to walk towards his gate.  As he did so, the JSO members knocked Mr. Fowler through a closed metal gate and onto the ground.  The JSO members then rolled Mr. Fowler onto his stomach, drove a knee into his back, and violently pulled his arms behind him to handcuff him, injuring Mr. Fowler in the process of effectuating his false arrest.  The charge on which Mr. Fowler was falsely arrested, resisting an officer without violence, was ultimately dismissed.  The JSO members involved were not disciplined or reprimanded for their actions against Mr. Fowler.

43. In June 2013, a member of JSO violently slammed Robert Slade to the ground causing him to hit his head, teeth, and shoulder, after he was involved in a minor traffic accident.  As Mr. Slade was merely asking the officer when his insurance information would be taken following the accident, he was forcefully thrown to

the ground.  Mr. Slade was falsely arrested for resisting an officer

without violence in violation of §843.02, Fla. Stat. (2012).  The

charges against Mr. Slade were dismissed.  The JSO member

involved was not disciplined or reprimanded for his actions against

Mr. Slade.

44. On November 12, 2014, at the Pretrial Detention Facility, a

member of JSO violently slammed Deandre Ezell's head into a

concrete wall, while Mr. Ezell was handcuffed.  The use of force

knocked Mr. Ezell unconscious and resulted in Mr. Ezell's

hospitalization.  At the time of the incident, Mr. Ezell was a minor.

45. In July 2015, members of JSO punched Kelli Wilson in the

face after she refused their unlawful commands to hand over her

cell phone.  JSO officers proceeded to violently take Wilson to the

ground, pulling her hair and attempting to rip her arms out from

under her.  Ms. Wilson was arrested for resisting without violence.

The charge against Ms. Wilson was dismissed.  JSO members were

not disciplined or reprimanded for their use of force against Ms.

Wilson.

46. In April 2016, members of JSO violently took down John

Blessing while effectuating his arrest.  The force caused Mr.

16

Blessing to lose 75% of the function in his arm.  The charges on which Mr. Blessing was arrested for—resisting without violence, disorderly intoxication, and battery—were ultimately dropped after the Court found the JSO officer did not investigate the alleged crime or establish probable cause.  JSO members involved were not disciplined or reprimanded for their actions against Mr. Blessing.

47. On April 27, 2016, Mayra Martinez was at her place of employment, Scores, when JSO officers arrived after calls about her intoxication.  JSO officers slammed Martinez into the pavement and punched her numerous times.  Upon arrival at the Pretrial Detention Facility, JSO officers hit Martinez with a closed fist in her stomach, chest, and face, knocking her unconscious.  Martinez remained handcuffed during the encounter.

48. On April 4, 2017, Connell Crooms was participating in a peaceful protest at Hemming Park Plaza in Jacksonville, Florida, when a counter-protestor reached his arm over the shoulder of a member of JSO and stuck his middle finger in Mr. Crooms's face. Rather than apprehend the aggressor, members of JSO threw Connell Crooms to the ground, struck him repeatedly in the back and face, and fired a Taser into his back, all of which caused Mr.

17

Crooms to lose consciousness and require hospitalization.  Mr.
Crooms is deaf and did not resist or disobey any of the officers'
commands.  The JSO members involved were not disciplined or
reprimanded for their use of force against Mr. Crooms.

49. On April 26, 2017, Daniel Nyman was seeking treatment at
UF Health Jacksonville when a member of JSO spat at Mr. Nyman,
charged at Mr. Nyman, threw him to the ground, shoved Mr.
Nyman's jaw into the ground with his knee, and then flipped Mr.
Nyman over and kneed him in the back.  Mr. Nyman required repair
of his previously treated broken jaw and five days in the hospital
because of the attack.  The JSO members involved were not
disciplined or reprimanded for their use of force against Mr. Nyman.

50. On June 23, 2017, Jonathan Williams was pulled over by
JSO officers, who placed one handcuff on Mr. Williams before
punching him twice in the face despite the fact he was not resisting.
The JSO officer proceeded to throw Mr. Williams to the ground
punching him in the back and kneeing him in the head.  Mr.
Williams suffered fractures in the right orbital wall, left inferior, and
medial orbital wall of his skull, as well as soft tissue swelling and

hematoma in the back of his head.  The officers involved in the use of force were not reprimanded or disciplined.

51. On October 8, 2017, members of JSO responded to a Walmart Loss Prevention Office for a potential shoplifting incident involving a male individual.  While effectuating his arrest, an officer grabbed Diana Murray, the male's significant other, by her neck and slammed her against a wall, then a bench before again slamming her into the wall and bench.  Both Ms. Murray and her significant other were cooperative with officers throughout the encounter.  The JSO member involved has not been disciplined or reprimanded for the use of force against Ms. Murray, nor has it been fully investigated.

52. On November 13, 2017, a twelve-year-old child, D.M. III, was walking home from school when JSO officers approached the young boy.  When he did not comply with their request to stop and instead continued walking to his mother, JSO officers slammed him on the ground.  D.M. III suffered numerous fractures, a cervical strain, and a sprain.  The officer involved in the use of force was not reprimanded or disciplined.

19

53. Accordingly, JSO has a practice, custom, and/or policy of failing to adequately investigate and discipline its officers for their excessive use of force.

## STATEMENT OF INJURIES

54. As a direct and proximate result of the actions of Defendants, Plaintiff Daniel Greagor suffered the following injuries:

a. Physical Injuries: Plaintiff sustained multiple bruises and contusions to his chest and face as a result of being repeatedly punched by Defendant Grant. These injuries caused significant pain and discomfort.

b. Pain and Suffering: Plaintiff experienced substantial pain and suffering due to the physical assault, which included facial bruising, swelling, and tenderness.  The pain and physical discomfort persisted for several days following the incident.

c. Emotional Distress: Plaintiff has suffered severe emotional distress, including but not limited to anxiety, fear, humiliation, and psychological trauma.  The incident has caused Plaintiff to experience sleep disturbances, flashbacks,

and a heightened sense of vulnerability and mistrust towards
law enforcement officers.

d. Long-term Psychological Impact: Plaintiff continues to
suffer from significant psychological impact, including chronic
anxiety, depression, and post-traumatic stress disorder
(PTSD), which has adversely affected his daily life, work
performance, and personal relationships. The trauma has led
to ongoing emotional suffering and a need for potential
psychological counseling and support.

e. Impact on Legal Matters and Family Relations: The
incident has further exacerbated Plaintiff's emotional distress
by being used as evidence against him in ongoing legal
proceedings. Plaintiff's wife has sought repeated injunctions
for protection against domestic violence and is using the
incident to gain leverage in divorce proceedings, causing
further emotional distress, damage to his reputation, and
complications in his personal life, and financial losses.

55. The injuries and emotional distress sustained by Plaintiff
were directly caused by the unlawful and excessive actions of

Defendants, for which Plaintiff seeks compensatory and punitive damages.

### COUNT I: EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT (42 U.S.C. § 1983) (DEFENDANT GRANT)

56. Plaintiff re-alleges and incorporates paragraphs 1 through 55 as though fully set forth herein.

57. On December 23, 2022, Defendant Cecil A. Grant, III entered Plaintiff's bedroom while Plaintiff was asleep and began questioning him without legal justification. After Plaintiff asked Defendant Grant and his partner to leave and invoked his right to counsel, Defendant Grant became hostile and confrontational.

58. When Plaintiff stepped outside the bedroom and raised his hand in a non-threatening manner, Defendant Grant struck him in the chest with a closed fist, then continued punching him in the face as Plaintiff retreated and attempted to shield himself. The use of force was not preceded by any criminal act, physical threat, or resistance on Plaintiff's part.

59. Defendant Grant then took Plaintiff to the ground and applied handcuffs while continuing to inflict pain. At no time was

Plaintiff physically resisting, and no use of force was necessary or reasonable under the circumstances.

60. The force used by Defendant Grant was objectively unreasonable and constituted a violation of Plaintiff's clearly established rights under the Fourth Amendment to the United States Constitution.

61. As a direct and proximate result of Defendant Grant's actions, Plaintiff suffered physical injuries, pain, emotional distress, and other damages.

62. Plaintiff seeks compensatory and punitive damages, attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988, and any other relief the Court deems appropriate.

**COUNT II: FAILURE TO INTERVENE UNDER THE FOURTH AMENDMENT (42 U.S.C. § 1983) (DEFENDANT DUNNEBACK)**

63. Plaintiff re-alleges and incorporates paragraphs 1 through 55 as though fully set forth herein.

64. On December 23, 2022, Defendant Michael Dunneback accompanied Defendant Grant into Plaintiff's bedroom and remained present during the entire encounter. He observed Defendant Grant escalate the interaction, strike

Plaintiff in the chest and face, and continue to use force while Plaintiff retreated and attempted to protect himself.

65. At no point did Defendant Dunneback attempt to intervene, despite having both the ability and the opportunity to do so. Instead, he stood by and verbally reinforced Grant's conduct by repeatedly shouting, "Don't touch him," even though Plaintiff had made no physical contact.

66. After the use of force ended, Defendant Dunneback participated in restraining Plaintiff and escorting him outside in handcuffs, wearing only boxer shorts, where he remained in freezing temperatures for nearly twenty-one minutes. When Plaintiff requested clothing or a blanket, Defendant Dunneback mocked him and offered no assistance.

67. Defendant Dunneback's failure to intervene in the use of excessive force, and his continued participation in Plaintiff's mistreatment, violated Plaintiff's clearly established rights under the Fourth Amendment.

68. As a direct and proximate result of Defendant Dunneback's inaction and conduct, Plaintiff suffered physical injury, emotional distress, and other damages.

24

69. Plaintiff seeks compensatory and punitive damages, attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988, and any other relief the Court deems appropriate.

**COUNT III: FALSE ARREST IN VIOLATION OF THE FOURTH AMENDMENT (42 U.S.C. § 1983) (DEFENDANT GRANT)**

70. Plaintiff re-alleges and incorporates paragraphs 1 through 55 as though fully set forth herein.

71. On December 23, 2022, Defendants Grant and Dunneback entered Plaintiff's bedroom while he was sleeping and woke him up.

72. Plaintiff asked Defendants Grant and Dunneback to leave his house and requested a lawyer, which Defendants Grant and Dunneback ignored.

73. Plaintiff raised his hands in a non-threatening manner.

74. Defendant Grant punched Plaintiff and subsequently arrested him without probable cause.

75. As a direct and proximate result of Defendants' actions, Plaintiff suffered loss of liberty, emotional distress, and other damages and losses.

76. Plaintiff seeks actual and compensatory damages, punitive damages, attorney's fees, and costs pursuant to 42 U.S.C. §§ 1983 and 1988, and any other relief the Court deems appropriate.

**COUNT IV: FALSE ARREST IN VIOLATION OF THE FOURTH AMENDMENT (42 U.S.C. § 1983) (DEFENDANT DUNNEBACK)**

77. Plaintiff re-alleges and incorporates paragraphs 1 through 55 as though fully set forth herein.

78. On December 23, 2022, Defendant Dunneback was present during the use of excessive force by Defendant Grant and did not have probable cause to believe Plaintiff had committed any criminal offense.

79. Defendant Dunneback was facing Defendant Grant and Plaintiff and witnessed Defendant Grant begin punching Plaintiff without legal cause.

80. While Plaintiff was being punched by Defendant Grant, Defendant Dunneback physically grabbed Plaintiff's legs, ankles, and arm and assisted in handcuffing him. Defendant Dunneback's use of physical force and assistance in effectuating the arrest contributed to the unlawful seizure of Plaintiff.

26

81. Defendant Dunneback lacked a lawful basis for seizing or restraining Plaintiff, and his actions violated clearly established rights under the Fourth Amendment.

82. As a direct and proximate result of Defendant Dunneback's actions, Plaintiff suffered loss of liberty, emotional distress, and other compensable harm.

83. Plaintiff seeks compensatory and punitive damages, attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988, and such other relief as the Court deems just and proper.

**COUNT V: FAILURE TO TRAIN AND SUPERVISE (42 U.S.C. § 1983)**

84. Plaintiff re-alleges and incorporates paragraphs 1 through 55 as though fully set forth herein.

85. Defendant T.K. Waters, in his official capacity as Sheriff of the City of Jacksonville, Florida, was responsible for the training, supervision, and discipline of JSO officers.

86. Defendant Waters failed to properly train and supervise Defendants Grant and Dunneback on the appropriate use of force and the handling of domestic situations, which led to the violation of Plaintiff's constitutional rights.

87. Defendant Waters' failure to train and supervise amounts to deliberate indifference to the rights of individuals with whom the JSO officers come into contact.

88. Defendant Waters, in his official capacity as Sheriff of the City of Jacksonville, and his agents and employees, acting within their authority and under color of state law, instituted and followed customs, practices, and/or policies which directly resulted in the use of excessive force against Plaintiff.  JSO has a widespread custom, practice, and/or policy of using excessive force.  By failing to discipline officers for the use of excessive force, Defendant Waters has ratified his agents' and employees' decisions and the reasons for such decisions, establishing a practice, custom, or policy.

89. JSO has a practice, custom, and/or policy of failing to adequately investigate and discipline its officers for their excessive use of force.

90. As a direct and proximate result of Defendant Waters' actions and inactions, Plaintiff suffered physical injury, emotional distress, and other damages and losses.

91. Plaintiff seeks actual and compensatory damages, punitive damages, attorney's fees, and costs pursuant to 42 U.S.C. §§ 1983 and 1988, and any other relief the Court deems appropriate.

**COUNT VI: ASSAULT (DEFENDANT GRANT)**

92. Plaintiff re-alleges and incorporates paragraphs 1 through 55 as though fully set forth herein.

93. On December 23, 2022, Defendant Grant entered Plaintiff's bedroom while he was asleep and began questioning him after he awoke.

94. Plaintiff asked the officers to leave his house and stated that he did not want to answer questions without an attorney present.

95. After a verbal exchange, Plaintiff stepped out of his bedroom and raised his hand to demonstrate that he was not a threat.

96. Without warning and in the absence of any physical threat, Defendant Grant punched Plaintiff in the chest and face.

97. Defendant Grant's actions placed Plaintiff in immediate apprehension of a harmful and offensive touching.

98. Defendant Grant's conduct constituted an intentional assault under Florida law.

99. As a direct and proximate result of the assault, Plaintiff suffered emotional distress and other damages.

100. Plaintiff seeks actual and compensatory damages, punitive damages, and any other relief the Court deems just and proper.

**COUNT VII: ASSAULT (DEFENDANT DUNNEBACK)**

101. Plaintiff re-alleges and incorporates paragraphs 1 through 55 as though fully set forth herein.

102. On December 23, 2022, Defendant Dunneback entered Plaintiff's bedroom while he was asleep and began aggressively questioning him without legal justification. Plaintiff asked Defendant Dunneback and his partner to leave the room and to allow him to contact an attorney.

103. Instead of honoring that request, Defendant Dunneback mocked Plaintiff's invocation of his rights and remained in the room while continuing the questioning.

104. Plaintiff attempted to disengage and return to sleep, but the officers remained standing over him, persistently challenging

30

him and suggesting he would be arrested if he raised his voice. Defendant Dunneback's demeanor, words, and proximity placed Plaintiff in fear that he would be subjected to unlawful force.

105. Shortly thereafter, Defendant Grant initiated the physical assault, and Defendant Dunneback stood by and shouted, "Don't touch him!" further escalating the encounter and reinforcing Plaintiff's fear of being attacked.

106. Defendant Dunneback's conduct was intentional, provocative, and created a reasonable apprehension in Plaintiff of imminent harmful or offensive contact, in violation of Florida law.

107. As a direct and proximate result of Defendant Dunneback's actions, Plaintiff suffered emotional distress and other damages.

108. Plaintiff seeks compensatory and punitive damages under Florida law, and any other relief the Court deems appropriate.

**COUNT VIII: BATTERY (DEFENDANT GRANT)**

109. Plaintiff re-alleges and incorporates paragraphs 1 through 55 as though fully set forth herein.

31

110. On December 23, 2022, after Plaintiff raised his hand in a non-threatening manner, Defendant Grant intentionally struck Plaintiff in the chest and face with a closed fist.

111. Defendant Grant continued to punch Plaintiff multiple times while Plaintiff retreated into his bedroom and shielded his face.

112. At no time did Plaintiff consent to Defendant's unlawful touching and striking.

113. Defendant Grant's conduct constituted a harmful and offensive touching, done without lawful justification or consent.

114. This unlawful and intentional physical contact constituted a battery under Florida law.

115. As a direct and proximate result of the battery, Plaintiff suffered physical injuries, pain, and emotional distress.

116. Plaintiff seeks actual and compensatory damages, punitive damages, and any other relief the Court deems just and proper.

## COUNT IX: BATTERY (DEFENDANT DUNNEBACK)

117. Plaintiff re-alleges and incorporates paragraphs 1 through 55 as though fully set forth herein.

32

118. On December 23, 2022, Defendant Dunneback intentionally and without consent made physical contact with Plaintiff by grabbing his legs, ankles, and arm and assisting in handcuffing him during an unlawful arrest.

119. At no time did Plaintiff consent to Defendant Dunneback's unlawful touching or striking, which was offensive, and occurred in the context of an ongoing use of excessive force by Defendant Grant. At the time of the contact, Plaintiff posed no threat and had not committed any criminal offense. The force used by Defendant Dunneback was neither necessary nor legally justified.

120. Under Florida law, an officer commits battery where physical contact is made intentionally and without legal justification. Defendant Dunneback's actions constituted a harmful or offensive touching of Plaintiff without consent and outside the bounds of lawful authority.

121. As a direct and proximate result of the battery committed by Defendant Dunneback, Plaintiff suffered physical pain, emotional distress, and other damages.

122. Plaintiff seeks compensatory and punitive damages, attorney's fees and costs where applicable, and such other relief as the Court deems just and proper.

**COUNT X: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER FLORIDA LAW (DEFENDANT GRANT)**

123. Plaintiff re-alleges and incorporates paragraphs 1 through 55 as though fully set forth herein.

124. On December 23, 2022, Defendant Grant entered Plaintiff's bedroom while Plaintiff was asleep and began questioning him despite repeated requests that he leave and that Plaintiff be allowed to contact an attorney.

125. Plaintiff attempted to de-escalate the situation by stepping away and raising his hand to show he was not a threat. Despite this, Defendant Grant struck Plaintiff in the chest and face with a closed fist, then continued to punch him repeatedly while Plaintiff retreated, covered his face, and called out in pain.

126. After taking Plaintiff into custody, Defendant Grant applied a painful wrist lock while escorting Plaintiff outside in freezing temperatures, leaving him handcuffed in his underwear for nearly twenty-one minutes in tem. When Plaintiff pleaded for

clothing or a blanket, Defendant Grant responded by mocking his discomfort.

127. Defendant's conduct was not merely excessive, but intentional, demeaning, and calculated to inflict distress. It occurred without legal justification and under color of state authority in Plaintiff's own home.

128. As a result, Plaintiff has suffered severe emotional distress, including anxiety, humiliation, sleep disruption, and trauma. These symptoms have persisted and have adversely impacted his personal relationships and ongoing legal matters.

129. In civil legal pleadings subsequent to Plaintiff's false arrest, his estranged wife Jennifer has repeatedly referred to Plaintiff being arrested for violence toward law enforcement officers, emphasizing that his arrest occurred due to Plaintiff's violent character and criminal conduct. Jennifer made these false allegations as a means to gain leverage in divorce proceedings, in child custody matters, and in repeated attempts to obtain injunctions against Plaintiff. Jennifer made these false allegations with full knowledge that Plaintiff did not engage in any criminal conduct whatsoever during his contact with Defendants Grant and

Dunneback, with knowledge that Plaintiff was falsely arrested after being assaulted, battered, and publicly humiliated by Defendants Grant and Dunneback, with full knowledge that Defendant Grant was terminated from his employment from JSO for his unlawful actions against Plaintiff that were undertaken under the color of Florida law, and that Defendant Dunneback assisted in the false arrest and assault of Plaintiff and Defendant Grant's unlawful assault and battery, and then participated Plaintiff's painful restraint and later humiliation. Jennifer was also aware that the charges had been dropped as a result of the unsubstantiated allegations against him. Jennifer's false and malicious claims regarding Plaintiff's arrest have caused him great emotional torment, loss of reputation and public humiliation.

130. Plaintiff is a government employee; he works for the United States Postal Service and was so employed on the date of his contact with Defendant Dunneback. As a direct result of Defendant Dunneback's participation in Defendant Grant's unlawful actions and his own unlawful actions, Plaintiff has suffered great emotional torment as will as loss of reputation and humiliation at his place of employment.

36

131. The conduct of Defendant Grant was so outrageous in character and extreme in degree as to go beyond all bounds of decency and is intolerable in a civilized society.

132. Accordingly, Plaintiff seeks compensatory and punitive damages under Florida law, as well as any other relief the Court deems appropriate.

**COUNT XI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (DEFENDANT DUNNEBACK)**

133. Plaintiff re-alleges and incorporates paragraphs 1 through 55 as though fully set forth herein.

134. On December 23, 2022, Defendant Dunneback entered Plaintiff's bedroom alongside Defendant Grant while Plaintiff was asleep. Despite Plaintiff's repeated requests for the officers to leave and his insistence on speaking with an attorney, Defendant Dunneback remained in the room and continued questioning him.

135. When Plaintiff attempted to disengage and de-escalate the situation, Defendant Dunneback mocked him by stating, "Sure, if you want to call your attorney at, ah, let's see, 6:30 at night on a holiday and pay for him to, like $400 dollars an hour answer

questions." Plaintiff then asked them to leave his home and ultimately returned to bed, covering up.

136. Despite knowing Plaintiff had committed no crime and that there was no lawful basis to remain, Defendant Dunneback stayed and encouraged further escalation. When Defendant Grant began striking Plaintiff, Defendant Dunneback did nothing to intervene. Instead, he stood by as the beating occurred and participated in restraining Plaintiff during and after the assault.

137. Once Plaintiff was in custody, Defendant Dunneback escorted him outside in handcuffs wearing only boxer shorts, despite the freezing temperature. Plaintiff repeatedly pleaded for clothing or a blanket. Defendant Dunneback ignored those requests and joined in mocking Plaintiff's discomfort.

138. The conduct of Defendant Dunneback was intentional, outrageous, and indifferent to the obvious likelihood of emotional trauma. Defendant Dunneback's conduct included verbal ridicule, refusal to intervene in an unlawful assault, and deliberate humiliation after the fact.

139. As a result, Plaintiff has suffered severe emotional distress, including anxiety, humiliation, loss of sleep, and trauma that continues to affect his daily life and personal relationships.

140. In civil legal pleadings subsequent to Plaintiff's false arrest, his estranged wife Jennifer has repeatedly referred to Plaintiff being arrested for violence toward law enforcement officers, emphasizing that his arrest occurred due to Plaintiff's violent character and criminal conduct. Jennifer made these false allegations as a means to gain leverage in divorce proceedings, in child custody matters, and in repeated attempts to obtain injunctions against Plaintiff. Jennifer made these false allegations with full knowledge that Plaintiff did not engage in any criminal conduct whatsoever during his contact with Defendants Grant and Dunneback, with knowledge that Plaintiff was falsely arrested after being assaulted, battered, and publicly humiliated by Defendants Grant and Dunneback, with full knowledge that Defendant Grant was terminated from his employment from JSO for his unlawful actions against Plaintiff that were undertaken under the color of Florida law, and that Defendant Dunneback assisted in the false arrest and assault of Plaintiff and Defendant Grant's unlawful

assault and battery, and then participated Plaintiff's painful restraint and later humiliation. Jennifer was also aware that the charges had been dropped as a result of the unsubstantiated allegations against him. Jennifer's false and malicious claims regarding Plaintiff's arrest have caused him great emotional torment, loss of reputation and public humiliation.

141. Plaintiff is a government employee; he works for the United States Postal Service and was so employed on the date of his contact with Defendant Dunneback. As a direct result of Defendant Dunneback's participation in Defendant Grant's unlawful actions and his own unlawful actions, Plaintiff has suffered great emotional torment as will as loss of reputation and humiliation at his place of employment.

142. Defendant Dunneback's behavior, taken together with his official role and participation in these events, rises to the level of outrageous conduct that is utterly intolerable in a civilized society.

143. Plaintiff seeks compensatory and punitive damages under Florida law, as well as any other relief the Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants Cecil A. Grant, III and Michael Dunneback, individually, and against Sheriff Timothy Kevin Waters in his official capacity, and the Jacksonville Sheriff's Office, awarding:

a) Compensatory damages;

b) Punitive damages where permitted by law;

c) Attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988 and applicable Florida law;

d) Any further relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

DATED this 9th day of July, 2025.

Respectfully Submitted,

*/s/ W. Charles Fletcher*
W. CHARLES FLETCHER, ESQ.
Fla. Bar No. 0125792
LAW OFFICE OF W. CHARLES
FLETCHER, P.A.
4237 Salisbury Rd, Ste 209
Jacksonville, Florida 32216
(904) 570-3527
fletcherlaw115@gmail.com
www.lawyerup904.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 9, 2025, I electronically filed the foregoing Amended Complaint with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ W. Charles Fletcher*
W. CHARLES FLETCHER, ESQ.

43